**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
**www.flsb.uscourts.gov**

In re:                                                                        **Chapter 11**

**MIAMI AIR INTERNATIONAL, INC.**                      **Case No. 20-13924-AJC**

           **Debtor.**

_____/

**DEBTOR'S *EXPEDITED* APPLICATION FOR AUTHORITY TO EMPLOY**
**CASSEL SALPETER & CO., LLC AS INVESTMENT BANKER TO**
**THE DEBTOR-IN-POSSESSION EFFECTIVE AS OF APRIL 6, 2020**

**(Expedited hearing requested on April 15, 2020)**

**MIAMI AIR INTERNATIONAL, INC**. ("Debtor" or "Miami Air"), by and through
undersigned counsel, hereby files this application (the "Application") pursuant to 11 U.S.C. §§
327(a) and 328(a) and Fed. R. Bankr. P. 2014(a), seeking entry of an order: (a) authorizing the
employment and retention of Cassel Salpeter  & Co., LLC ("Cassel Salpeter ") to serve as the
Debtor's investment banker effective as of April 6, 2020, (b) approving the terms of the
Engagement Letter (as defined herein), including the compensation structure and indemnification
provision; (c) waiving and /or modifying the timekeeping requirements of Rule 2016-1 of the
Local Bankruptcy Rules for the Southern District of Florida and guidelines of the Office of the
United States Trustee for Fee Applications for Professionals in the Southern District of Florida in
Bankruptcy Cases (the "Guidelines") in connection with the Cassel Salpeter engagement; and (d)
granting such other relief as just and proper.  In support of this Application, the Debtor submits
the *Declaration of James S. Cassel in Support of Debtor's Application for Authority to Employ*
*Cassel Salpeter & Co., LLC, as Investment Banker to the Debtor-in-Possession Effective as of*
*April 6, 2020* attached hereto as **Exhibit "A"** (the "Cassel Declaration") and the *Declaration of*

*Annette M. Eckerle  in Support of the Chapter 11 Petition and First Day Motions* [ECF No. 29](the "<u>First Day Declaration</u>").  In further support of this Application, the Debtor respectfully represents as follows:

## I.      <u>JURISDICTION</u>

1.      This Court has jurisdiction over this case pursuant to 28 U.S.C. 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A).

2.      Venue is proper in this District pursuant to 28 U.S.C. §1408.

3.      The statutory predicates for the relief requested herein are 11 U.S.C. §327(a) and 328(a) of title 11 of the United States Code, 11 U.S.C. 101 *et seq* (as amended or modified, the "<u>Bankruptcy Code</u>"), Rules 2014(a) and 2016 of the Federal Rules of Bankruptcy Procedure ("<u>Bankruptcy Rules</u>"), and Local Rules 2014-1(A) and 2016-1(A) (the "<u>Local Rules</u>").

## II.      <u>BACKGROUND AND BUSINESS OPERATIONS</u>

4.      On March 24, 2020 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition in this Court for relief under Chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>").

5.      As of the date hereof, no creditors' committee has been appointed in this case.  In addition, no trustee or examiner has been appointed.

6.      The Debtor is operating its business and managing its affairs as a debtor in possession pursuant to 11 U.S.C. §§1107(a) and 1108.

7.      For a detailed description of the Debtor, its operations and assets and liabilities, the Debtor respectfully refers the Court and parties-in-interest to the First Day Declaration.

## III.      <u>RELIEF REQUESTED</u>

8.      By this Application, the Debtor seeks entry of an order, pursuant to sections

§327(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rules 2014(a) and 2016 and Local Rules 2014-1 and 2016-1: (a) authorizing the employment and retention of Cassel Salpeter as its investment banker during the pendency of this case in accordance with the terms and conditions set forth in the engagement letter dated as of April 6, 2020 (the "Engagement Letter"), a copy of which is attached hereto as **Exhibit "B";** (b) approving the provisions of the Engagement Letter, including the proposed compensation structure and the indemnification and reimbursement provisions set forth in the Engagement Letter, pursuant to section 328(a) of the Bankruptcy Code; (c) waiving and/or modifying the timekeeping requirements of Local Rule 2016-1, and the Guidelines in connection with Cassel Salpeter's proposed engagement; and (d) granting such other relief as may be just and proper.

## IV.   CASSEL SALPETER'S RETENTION AND FEE STRUCTURE

### A.   Cassel Salpeter's Qualifications

9.   Cassel Salpeter is a leading independent investment banking firm that provides advisory services to owners and boards of directors of middle-market private and public companies on a variety of M&A transactions, equity and debt financings, and financial advisory assignments, across a wide range of industry verticals and emerging growth companies in the United States. Together, the firm's professionals have more than 100 years of experience providing private and public companies with a broad spectrum of investment banking and financial advisory services, including: (i) general financial advice, (ii) advisory services, (iii) mergers, acquisitions and divestitures, (iv) equity and debt capital raises, (v) valuations (vi) fairness and solvency opinions and (vii) restructurings, such as section 363 bankruptcy sales and plans of reorganization. Co-founded by James Cassel and Scott Salpeter, the firm provides objective, unbiased, results-focused services that clients need to

achieve their goals.  The firm's senior partners have forged relationships and completed hundreds of transactions and assignments nationwide.  The firm's headquarters are in Miami, Florida.

10.    Cassel Salpeter's professionals are providing or have provided investment banking and other services in connection with the restructuring or sale of the following companies: *Gulfstream International Airlines; LumaStream, Inc.; Helios and Matheson Analytics, Inc.* (OTCPK:HMNY)*; Achaogen, Inc.* (NasdaqGM:AKAO); *Avadel Specialty Pharmaceuticals, LLC*; *1 Global Capital LLC; Sancilio Pharmaceuticals Company, Inc.; NephroGenex, Inc.* (Nasdaq:NRX)*; Dynavox, Inc.* (OTCPK:DVOX.Q)*; Electrolytic Technologies Corporation; Brijot Millimeter Wave Technologies, Corp.; HeathStar Communications, Inc.; HC Innovations, Inc.; Stant Corp.; AFP Imaging Corp.; Nailite International, Inc.; OMI Medical Imaging; Nitram, Inc.; and uniDigital, Inc.*

11.    The Debtor has selected Cassel Salpeter as its investment banker based upon, among other things: (a) the Debtor's need to retain a skilled investment banking firm to provide advice with respect to the Debtor's sale activities, including marketing for, and reviewing, analyzing, negotiating and conducting a sale or sales process of, all or some of the Debtor's assets pursuant to a section 363 of the Bankruptcy Code or a plan of reorganization; and (b) Cassel Salpeter's extensive experience and excellent reputation in providing investment banking services in complex chapter 11 cases as described hereinabove.  In light of the size and complexity of this chapter 11 case, Cassel Salpeter's resources, capabilities and experience are crucial to the success of this case. An experienced investment banker and financial advisor, such as Cassel Salpeter fulfills a critical service that complements the services provided by the Debtor's other professionals. As discussed in detail below, Cassel Salpeter will concentrate its

efforts on serving as the Debtor's investment banker and, more specifically, in leading the Debtor's sale process.

**B.    Services to be Provided**

12.    As more fully described in the Engagement Letter, the services to be provided by Cassel Salpeter will include, among others (collectively, the "<u>Services</u>")[1] the following:

**a)  General Advisory Services**

(i)   Reviewing and analyzing the Debtor's business, operations and financial projections;

(ii)  Assisting in the determination of a range of values for the Debtor on a going concern basis; and

(iii) Providing testimony, as necessary, with respect to matters on which Cassel Salepter has been engaged to advise under its Engagement Letter in any proceeding before the Bankruptcy Court.

**b)  Sale Transaction Services**

(i)   Assisting the Debtor in identifying and evaluating candidates for any potential Sale Transaction;

(ii)    Advising the Debtor in connection with negotiations, and aiding in the consummation of any such Sale Transaction;

(iii) Advising with regards to possible affiliations with strategic operators; and

(iv) Advising with regards to divestitures of non-strategic assets.

13.    The Debtor believes that it is in the best interests of the Debtor's estate to employ Cassel Salpeter as its investment banker to provide the services listed above and in the Engagement Letter.

14.    Through this retention, Cassel Salpeter intends to provide the services outlined above to the Debtor and to staff this project with members of its firm, who will endeavor to work

---

[1] The summaries provided in this Application are included for convenience only. In the event of any inconsistency between any summary and the terms and provisions of the Engagement Letter, the terms of the Engagement Letter shall control. Capitalized terms used but not otherwise defined in the summaries of the Engagement Letter contained herein shall have the meanings ascribed to such terms in the Engagement Letter.

diligently, efficiently, and to avoid duplication of efforts of any other professionals that the Debtor may retain in this Chapter 11 case through regular communication with the Debtor and by focusing on the services for which Cassel Salpeter has been retained.

15.    Based on the foregoing, the Debtor believes that Cassel Salpeter is both well-qualified and uniquely able to represent the Debtor in its Chapter 11 case in an efficient and timely manner and that the engagement of Cassel Salpeter to provide investment banking services to the Debtor is essential to the successful marketing and sale of the company, and in the best interests of its creditors.

### C.    Professional Compensation

16.    Cassel Salpeter's decision to advise and assist the Debtor in connection with this chapter 11 case is subject to its ability to be retained in accordance with the terms of the Engagement Letter pursuant to section 328(a), and not section 330, of the Bankruptcy Code.

17.    As more fully described in the Engagement Letter and subject to the Court's approval, the Debtor has agreed to pay Cassel Salpeter according to the following compensation structure (the "Fee Structure") which is summarized in relevant part as follows:

a)    **Initial Fee**.  A non-refundable, cash fee, payable by check or wire transfer in immediately available U.S. funds, of: (i) $50,000 upon entry of final order approving the Application, and (ii) $50,000 thirty days from the date of the Engagement Letter.

b)    **Sale Transaction Fee**.  If the Debtor consummates a Sale Transaction, the Debtor shall pay to Cassel Salpeter a sale transaction fee (the "Sale Transaction Fee"), payable by check or wire transfer in immediately available U.S. funds at the closing of the Sale Transaction, equal to $500,000 plus 2.0 % of the Sale Consideration (as defined in Exhibit A to the Engagement Letter) in excess of $10 million.  Notwithstanding the foregoing, in the event any Sale Transaction(s) includes deferred and/or contingent payment(s), the Debtor shall pay to Cassel Salpeter the portion of any Sale Transaction Fee relating thereto, payable in cash by check or wire transfer in immediately available U.S. funds, if and when such deferred and/or contingent payment(s) is actually paid.

c)    **Multiple Closings**.  If more than one Sale Transaction is consummated, Cassel Salpeter shall be compensated based on the aggregate Consideration of all Sale

Transactions, calculated in the manner set forth above.

d) **Fee Obligation**.  Cassel Salpeter  shall be entitled to  the  fees set forth herein if  any Sale Transaction  is consummated during  the  Term, or within two  (2) years after  the date of any termination or expiration of the Engagement Letter (the  "Tail Period"), or the Debtor, or its security holders, enters  into  any definitive agreement  regarding a Sale Transaction  during  the  Term  or  the  Tail Period  that  subsequently  closes  (whether during  or  after  the  Tail Period), regardless  of  whether Cassel Salpeter actually procured the agreement  regarding  the Sale Transaction.

18.      In  addition  to  the  above  fees,  the  Debtor  agrees  to  promptly  reimburse  Cassel Salpeter, upon request, for all reasonable out-of-pocket expenses incurred by Cassel Salpeter in connection  with  the  Engagement  Letter  or  the  performance  thereof,  whether  or  not  any  Sale Transaction or other type of transaction is consummated, including, but not limited to, travel and lodging,  databases,  fees  and  disbursements  of  Cassel  Salpeter's  counsel,  and  any  other consultants and advisors retained by Cassel Salpeter.  All fees due to Cassel Salpeter as set forth above shall not be subject to offsets, are non-refundable and non-cancelable.

19.      The Fee Structure is consistent with Cassel Salpeter's typical fee for work of this nature and comparable to those generally charged by financial advisory and investment banking firms of similar stature and reflects a balance between a fixed fee, and a contingency amount which  is  tied  to  the  consummation  and  closing  of  the  transactions  contemplated  in  the Engagement Letter.

20.      The Debtor believes that the fees are set at a level designed to compensate Cassel Salpeter fairly for the  work  of its professionals and assistants and to cover fixed and routine overhead expenses.  The Debtor understands that it is Cassel Salpeter's policy to charge its clients for all disbursements and expenses incurred in the rendition of services.

21.      The  Debtor  acknowledges  that  this  engagement  will  require  a  substantial professional commitment of time and effort by Cassel Salpeter.    Moreover, the amount of time

and effort may vary substantially during different periods of this engagement.  As a result, in order to ensure the availability of all necessary professional resources, whenever required, Cassel Salpeter may be foreclosed from pursuing other alternative engagement opportunities.  In light of the foregoing, the Debtor believes that the Fee Structure described above and provided for in the Engagement Letter is reasonable and fairly compensates Cassel Salpeter for its Services.

22.     The Debtor further understands that it is not the general practice of investment banking firms such as Cassel Salpeter to keep detailed time records similar to those customarily kept by attorneys and other professionals who are compensated on an hourly basis.

23.     Bankruptcy Rule 2016 and Local Rule 2016-1 require retained professionals to submit applications for payment of compensation in chapter 11 cases in accordance with the Guidelines.   Pursuant to Local Rule 2016-1(B)(3), the Guidelines apply in all chapter 11 cases and require retained professionals to submit detailed time entries that set forth, among other things: (i) a detailed description of each activity performed, (ii) the amount of time spent on that activity (in tenth of an hour increments), (iii) the subject matter of the activity, and (iv) the parties involved with the activity of issue.  However, the Guidelines allow retained professional to request a variance from these Guidelines for cause.

24.     Cassel Salpeter has requested an initial non-refundable fee of $100,000 which is customary in the investment banking services industry.   The balance of Cassel Salpeter's fee is contingent and predicated upon the closing of a Sales Transaction.  As such, the submission of detailed time entries, pursuant to the Guidelines is unnecessary.  The Debtor believes that for Cassel Salpeter to recreate the time entries for its restructuring personnel and require its non-restructuring personnel to record their time as prescribed by the Local Rules and Guidelines would be, in each case, unduly burdensome and time-consuming.

25.     The Fee Structure and amount of Cassel Salpeter's proposed fees, including the Sale Transaction Fee, is reasonable regardless of the number of hours to be expanded by Cassel Salpeter's professionals in the performance of the services to be provided.  Therefore, the Debtor submits that Cassel Salpeter's professionals should not be required to maintain time records and the proposed fees should not be considered to be "bonuses" or fee enhancements under applicable law and that the Sale Transaction Fee due and payable to Cassel Salpeter shall be paid directly out of any gross cash proceeds of any Sale Transaction.

26.     Accordingly, by this Application, the Debtor is seeking, on behalf of Cassel Salpeter, a waiver and/or modification of the billing requirements set forth in Local Rule 2016-1 and approval of the Fee Structure set forth in the Engagement Letter.

**E.      Indemnification Provision**

27.     In addition to the foregoing, as set forth more fully in Exhibit A to the Engagement Letter and as a material part of the consideration for Cassel Salpeter's agreement to provide investment banking services to the Debtor, the Debtor has agreed to indemnify, defend and hold harmless the Indemnified Parties (as defined in Engagement Letter) (the "Indemnity Provision").

28.     The Indemnity Provision is a reasonable term and condition of Cassel Salpeter's engagement. Bankers and financial advisors rely heavily on information provided by debtors in making contacts with potential lenders, investors, buyers, or other parties to potential transactions. It is customary, for this reason, that investment bankers or financial advisors receive indemnification from the entities for whom they work. The Indemnity Provision is comparable to those generally obtained by financial advisory and investment banking firms of similar stature to Cassel Salpeter and for comparable engagements in this

district and other jurisdictions.

29.     The Engagement Letter makes clear that no indemnification is available for losses that are determined, by a final judicial determination, to have resulted from Cassel Salpeter's gross negligence or willful misconduct.

30.     The Debtor submits that the Indemnity Provision contained in Exhibit A to the Engagement Letter, viewed in conjunction with the other terms of Cassel Salpeter's proposed retention, are reasonable and in the best interests of the Debtor and all other stakeholders. Accordingly, as part of this Application, the Debtor requests that the Court approve the Indemnity Provision.

      **F.     Cassel Salpeter's Disinterestedness**

31.     The Bankruptcy Code allows a debtor, with the Court's approval, to employ one or more professional persons "that do not hold or represent an interest adverse to the estate, and that are disinterested persons."  11 U.S.C. § 327(a).

32.     In connection with its proposed retention by the Debtor in this case, Cassel Salpeter undertook to determine whether it had any conflicts or other relationships that might cause it not to be disinterested or to hold or represent an interest adverse to the Debtor. Specifically, Cassel Salpeter reviewed a list of the creditors of the Debtor, equity holders and other interested parties of the Debtor, the business records of Cassel Salpeter, including its conflicts database, and the responses to conflict checks circulated throughout the firm.

33.     To the best of the Debtor's knowledge, information and belief, and except to the extent disclosed in the Cassel Declaration, Cassel Salpeter: (a) is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code, as modified by section 1107(b); (b) does not hold or represent an interest adverse to the Debtor's estate and (c ) has no connection to

the Debtor's, its creditors or related parties.

34.    Further, to the best of the Debtor's knowledge and except as is disclosed in the Cassel Declaration, Cassel Salpeter: (a) does not have any connections with the Debtor, its creditors, any other party in interest, or its respective attorneys; and (b) no person employed by Cassel Salpeter assigned to this matter has any connection with the United States Bankruptcy Judge assigned to this case or staff member of the U.S. Trustee that would render its retention in this chapter 11 case improper under Bankruptcy Rule 5002.

35.    The Debtor is informed that Cassel Salpeter will not share any compensation to be paid by the Debtor, in connection with services to be performed after the Petition Date, with any other person, other than principals and employees of Cassel Salpeter, to the extent required by section 504 of the Bankruptcy Code.

36.    Immediately upon being engaged, Cassel Salpeter's professionals commenced the process of discussing with the Debtor's management and outside professionals to fully understand the challenges and opportunities faced by the Debtor and began actively providing services to the Debtor.  As such, the Debtor requests that Cassel Salpeter's retention be made  effective as of April 6, 2020, in order to allow Cassel Salpeter to be compensated for the work  it performs for the Debtor as of its Engagement Letter and prior to the Court's consideration  of this Application.

## V.    BASIS FOR RELIEF REQUESTED

### A.    The Debtor Should be Permitted to Retain and Employ Cassel Salpeter on the Terms of the Engagement Letter Pursuant to Sections 327 and 328 of the Bankruptcy Code.

37.    The Debtor seeks approval of the retention and employment of Cassel Salpeter pursuant  to  sections  327(a)  and  328(a)  of  the  Bankruptcy  Code.  Section  327(a)  of  the

Bankruptcy Code which provides, in part, that a debtor in possession "may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist" the debtor in possession in carrying out its duties. 11 U.S.C. § 327(a).  Bankruptcy Rule 2014 requires that an application for retention include certain specific facts showing the necessity for the employment and other information, including, among others, the  professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the [firm's] connections with the debtor, creditors, any other party in interest, its respective attorneys and accountants, the United States Trustee, or any person employed in the office of the United States Trustee.

38.     In addition, section 328(a) of the Bankruptcy Code, provides, in relevant part, that the Debtor "with the court's approval, may employ or authorize the employment of a professional person under section 327 . . . on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis." 11 U.S.C. § 328(a).  Accordingly, section 328 permits the compensation of professionals, including investment bankers, on more flexible terms that reflect the nature of their services and market conditions as proposed hereinabove.

39.     The Debtor submits that Cassel Salpeter satisfies the above statutory criteria and the compensation structure set forth in the Engagement Letter is reasonable under section 328(a) of the Bankruptcy Code.  The Debtor further submits that the proposed Fee Structure should not be subject to the standard of review under section 330 of the Bankruptcy Code for the reasons set forth herein.

40.     As discussed above and in the Cassel Declaration, Cassel Salpeter satisfies the

disinterestedness standard in section 327(a) of the Bankruptcy Code. Additionally, given the numerous issues that Cassel Salpeter may be required to address in the performance of its services for the Debtor pursuant to the Engagement Letter, the Debtor believes that the terms and conditions of the Engagement Letter are fair, reasonable and market-based under the standards set forth in section 328(a) of the Bankruptcy Code.

41.     The Debtor believes that the Fee Structure appropriately reflects (a) the nature and scope of services to be provided by Cassel Salpeter; (b) Cassel Salpeter's substantial experience with respect to investment banking and financial advisory services; and (c) the fee structures typically utilized by Cassel Salpeter and other leading investment banks and financial advisors who do not bill their clients on an hourly basis.

42.     As set forth above, the Debtor proposes that its obligation to pay any fee, expense or indemnity to Cassel Salpeter not be subject to any reduction by way of setoff, recoupment or counterclaim.  The Debtor request that the requirements of Local Rule 2016-1 and the Guidelines be tailored to the nature of Cassel Salpeter's engagement and its compensation structure.  It is not the general practice of investment banking firms like Cassel Salpeter to keep detailed time records similar to those customarily kept by attorneys.  As such, the Debtor request a waiver and/or modification of the requirements under Local Rule 2016-1 and the Guidelines. Similar fixed and contingency fee arrangements have been approved and implemented by courts in other large chapter 11 cases in this district. *See, e.g.*, *In re DM Industries, Ltd*., Case No. 09-15533-LMI (Bankr. S.D.Fla. March 2009); *In re Medical Staffing Network Holdings, Inc.,* Case No 10-29101-EPK (Bank. S.D.Fla July 2010); and *In re TLO, LLC*, Case No. 13-20853-PGH (Bankr. S.D.Fla August 12, 2013).

**B.      The Indemnification and Contribution Terms of the Engagement Letter Are Appropriate.**

43.     The Indemnity Provision was negotiated between the Debtor and Cassel Salpeter at arms-length and is fair and reasonable.  The Debtor believes that the indemnification and contribution provisions set forth in Exhibit A to the Engagement Letter is customary and reasonable for investment bankers, both out-of-court and in Chapter 11 proceedings.  *See, e.g., In re United Artists Theatre Company*, 315 F.3d 217 (3d Cir. 2003) (authorizing the indemnification of Houlihan Lokey by the debtors);  *In re Joan & David Halpern, Inc.*, 248 B.R. 43 (Bankr. S.D.N.Y. 2000). The Indemnification Provision is also similar to other indemnification provisions that have been approved by bankruptcy courts.  *See, e.g., In re Sharper Image Corp.*, Case No. 08-10322 (KG) (Bankr. D. Del. May 14, 2008) (order authorizing retention of Gemini Valuation Services, LLC on similar terms);  *In re Premium Papers Holdco, LLC*, Case No. 06-10269 (Bankr. D. Del. May 3, 2006) (order authorizing retention of Giuliani Capital Advisors on similar terms);  *In re Burlington Industries, Inc.*, Case No. 01-11282 (RJN) (Bankr. D. Del. May 21, 2003) (order authorizing retention of Hostmann on similar terms);  *In re Oakwood Homes Corporation*, Case No. 02-13396 (PJW) (Bankr. D. Del. July 21, 2003) (same).  Accordingly, the Debtor respectfully submits that the terms of the Indemnity Provision is reasonable and customary and should be approved in this chapter 11 case.

44.     Based on the foregoing, the Debtor submits that it has satisfied the requirements of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules to support entry of an order authorizing the Debtors to retain and employ Cassel Salpeter in this chapter 11 case on the terms and conditions described herein and in the Engagement Letter.

**WHEREFORE**, the Debtor respectfully requests entry of an order in the form attached hereto as **Exhibit "C":** (a) authorizing the employment and retention of Cassel Salpeter  & Co., LLC to serve as the Debtor's investment banker effective as of April 6, 2020, (b)

approving the terms of the Engagement Letter, including the compensation structure and indemnification provision; (c) waiving and /or modifying the timekeeping requirements of Rule 2016-1 of the Local Bankruptcy Rules for the Southern District of Florida and Guidelines in connection with the Cassel Salpeter engagement; and (d) granting such other relief as just and proper.

Dated: April 10, 2020.

**GENOVESE JOBLOVE & BATTISTA, P.A.**
*Attorneys for Debtor-in-Possession*
100 Southeast Second Street, Suite 4400
Miami, Florida 33131
Telephone: (305) 349-2300
Facsimile: (305) 349-2310

By:    /s/*Paul J. Battista*
         Paul J. Battista, Esq.
         Florida Bar No. 884162
         pbattista@gjb-law.com
         Mariaelena Gayo-Guitian, Esq.
         Florida Bar No. 813818
         mguitian@gjb-law.com
         Heather L. Harmon, Esq.
         Florida Bar No. 013192
         hharmon@gjb-law.com

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing Application was

served this <u>10th</u> day of April, 2020 via CM/ECF to all parties registered to receive electronic

notice.

**GENOVESE JOBLOVE & BATTISTA, P.A.**
*Attorneys for Debtor-in-Possession*
100 Southeast Second Street, Suite 4400
Miami, Florida 33131
Telephone: (305) 349-2300
Facsimile: (305) 349-2310

By:     /s/*Paul J. Battista*
        Paul J. Battista, Esq.
        Florida Bar No. 884162
        pbattista@gjb-law.com
        Mariaelena Gayo-Guitian, Esq.
        Florida Bar No. 813818
        mguitian@gjb-law.com
        Heather L. Harmon, Esq.
        Florida Bar No. 013192
        hharmon@gjb-law.com

# EXHIBIT "A"

## (DECLARATION OF JAMES S. CASSEL)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
**www.flsb.uscourts.gov**

In re:                                                    **Chapter 11**

**MIAMI AIR INTERNATIONAL, INC.**                         **Case No. 20-13924-AJC**

              **Debtor.**
_____/

**DECLARATION OF JAMES S. CASSEL IN SUPPORT OF DEBTOR'S**
**EXPEDITED APPLICATION FOR AUTHORITY TO EMPLOY**
**CASSEL SALPETER & CO., LLC AS INVESTMENT BANKER TO THE**
**DEBTOR-IN-POSSESSION EFFECTIVE AS OF APRIL 6, 2020**

I, James S. Cassel, under penalty of perjury, represent as follows:

1.      I am Chairman of the investment banking firm Cassel Salpeter & Co., LLC ("Cassel Salpeter") which has as its principal place of business at 801 Brickell Avenue, Suite 1900, Miami, Florida 33131.

2.      This Declaration is being submitted in connection with the proposed employment and retention application of Cassel Salpeter as investment banker to the Debtor to perform services as set forth in the *Debtor's Expedited Application for Authority To Employ Cassel Salpeter & Co, LLC as Investment Banker to the Debtor-in-Possession Effective as of April 6, 2020* (the "Application")[1].

3.      This Declaration is also submitted as the statement required pursuant to sections 327(a) and 328(a) of title 11, United States Code (11 U.S.C. §§ 101 et seq.) (the "Bankruptcy Code") and Rule 2014(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

---

[1] Capitalized terms not defined in this declaration are used as defined in the Application or Engagement Letter.

2848521-2

4.      The facts set forth in this Declaration are based upon facts of which I have personal knowledge, my review of relevant documents, information supplied to me by the Debtor and/or its professionals or other professionals at Cassel Salpeter, or my views and knowledge of the Debtor's business and financial condition.  If called and sworn as a witness, I would testify competently to the facts set forth herein.

## Cassel Salpeter's Qualifications

5.      Cassel Salpeter is a leading independent investment banking firm that provides advisory services to owners and boards of directors of middle-market private and public companies on a variety of M&A transactions, equity and debt financings, and financial advisory assignments, across a wide range of industry verticals and emerging growth companies in the United States. Together, the firm's professionals have more than 100 years of experience providing private and public companies with a broad spectrum of investment banking and financial advisory services, including: (i) general financial advice, (ii) advisory services, (iii) mergers, acquisitions and divestitures, (iv) equity and debt capital raises, (v) valuations (vi) fairness and solvency opinions and (vii) restructurings, such as section 363 bankruptcy sales and plans of reorganization.

6.      Cassel Salpeter's professionals are providing or have provided investment banking and other services in connection with the restructuring or sale of the following companies: *Gulfstream International Airlines; LumaStream, Inc.; Helios and Matheson Analytics, Inc.* (OTCPK:HMNY)*; Achaogen, Inc.* (NasdaqGM:AKAO); *Avadel Specialty Pharmaceuticals, LLC*; *1 Global Capital LLC; Sancilio Pharmaceuticals Company, Inc.; NephroGenex, Inc.* (Nasdaq:NRX)*; Dynavox, Inc.* (OTCPK:DVOX.Q)*; Electrolytic Technologies Corporation; Brijot Millimeter Wave Technologies, Corp.; HeathStar*

*Communications, Inc.; HC Innovations, Inc.; Stant Corp.; AFP Imaging Corp.; Nailite International, Inc.; OMI Medical Imaging; Nitram, Inc.; and uniDigital, Inc.*

7.     The Debtor has selected Cassel Salpeter as its investment banker based upon, among other things: (a) the Debtor's need to retain a skilled investment banking firm to provide advice with respect to the Debtor's sale activities, including marketing for, reviewing, analyzing, negotiating and conducting a sale or sales process of, all or some of the Debtor's assets pursuant to a section 363 of the Bankruptcy Code or a plan of reorganization; and (b) Cassel Salpeter's extensive experience and excellent reputation in providing investment banking services in complex chapter 11 cases.

8.     Immediately upon being engaged, Cassel Salpeter's professionals commenced the process of discussing with the Debtor's management and outside professionals to fully understand the challenges and opportunities faced by the Debtor and began actively providing services to the Debtor.  Therefore, Cassel Salpeter requests that its retention be  made  effective as of April 6, 2020, in order to allow Cassel Salpeter t o  be compensated for the work it performs for the Debtor as of its Engagement Letter and prior to the Court's consideration of the Application.

**Services to be Provided**

9.     As more fully described in the Engagement Letter, the services to be provided by Cassel Salpeter will include, among others (collectively, the "Services") the following:

a)  **General Advisory Services**

(i)   Reviewing and analyzing the Debtor's business, operations and financial projections;

(ii)  Assisting in the determination of a range of values for the Debtor on a going concern basis; and

(iii) Providing testimony, as necessary, with respect to matters on which Cassel Salpeter

has been engaged to advise under its Engagement Letter in any proceeding before the Bankruptcy Court.

**b)  Sale Transaction Services**

(i)   Assisting the Debtor in identifying and evaluating candidates for any potentialSale Transaction;

(ii)   Advising the Debtor in connection with negotiations, and aiding in the consummation of any such Sale Transaction;

(iii) Advising with regards to possible affiliations with strategic operators; and

(iv) Advising with regards to divestitures of non-strategic assets.

10.     Through this retention, Cassel Salpeter intends to provide the services outlined above to the Debtor and to staff this project with members of its firm, who will endeavor to work diligently, efficiently, and to avoid duplication of efforts of any other professionals that the Debtor may retain in this Chapter 11 case through regular communication with the Debtor and by focusing on the services for which Cassel Salpeter has been retained.

## Professional Compensation

11.     Cassel Salpeter's decision to advise and assist the Debtor in connection with this chapter 11 case is subject to its ability to be retained in accordance with the terms of the Engagement Letter pursuant to section 328(a), and not section 330, of the Bankruptcy Code.

12.     As more fully described in the Engagement Letter and subject to the Court's approval, the Debtor has agreed to pay Cassel Salpeter according to the following compensation structure (the "Fee Structure"), which is summarized in relevant part as follows:

a)     **Initial Fee**.  A non-refundable, cash fee, payable by check or wire transfer in immediately available U.S. funds, of: (i) $50,000 upon entry of final order approving the Application, and (ii) $50,000 thirty days from the date of the Engagement Letter.

b)   **Sale Transaction Fee**.  If the Debtor consummates a Sale Transaction, the Debtor shall pay to  Cassel Salpeter a sale transaction fee  (the  "Sale Transaction Fee"),

payable by check or wire transfer in immediately available U.S. funds at the closing of the Sale Transaction, equal to $500,000 plus 2.0 % of the Sale Consideration (as defined in Exhibit A to the Engagement Letter) in excess of $10 million. Notwithstanding the foregoing, in the event any Sale Transaction(s) includes deferred and/or contingent payment(s), the Debtor shall pay to Cassel Salpeter the portion of any Sale Transaction Fee relating thereto, payable in cash by check or wire transfer in immediately available U.S. Funds, if and when such deferred and/or contingent payment(s) is actually paid.

c)  **Multiple Closings**.  If more than one Sale Transaction is consummated, Cassel Salpeter shall be compensated based on the aggregate Consideration of all Sale Transactions, calculated in the manner set forth above.

d)  **Fee Obligation**.  Cassel Salpeter shall be entitled to the fees set forth herein if any Sale Transaction is consummated during the Term, or within two (2) years after the date of any termination or expiration of the Engagement Letter (the "Tail Period"), or the Debtor, or its security holders, enters into any definitive agreement regarding a Sale Transaction during the Term or the Tail Period that subsequently closes (whether during or after the Tail Period), regardless of whether Cassel Salpeter actually procured the agreement regarding the Sale Transaction.

13.    In addition to the above fees, the Debtor agrees to promptly reimburse Cassel Salpeter, upon request, for all reasonable out-of-pocket expenses incurred by Cassel Salpeter in connection with the Engagement Letter or the performance thereof, whether or not any Sale Transaction or other type of transaction is consummated, including, but not limited to, travel and lodging, databases, fees and disbursements of Cassel Salpeter's counsel, and any other consultants and advisors retained by Cassel Salpeter.  All fees and reimbursable expenses due to Cassel Salpeter shall have no offsets, are non-refundable and non-cancelable.

14.    The Fee Structure is consistent with Cassel Salpeter's typical fee for work of this nature and comparable to those generally charged by financial advisory and investment banking firms of similar stature and reflects a balance between a fixed fee, and a contingency amount which is tied to the consummation and closing of the transactions contemplated in the Engagement Letter.

15.    Cassel Salpeter's restructuring expertise, as well as financing skills and mergers

and acquisitions expertise, some or all of which may be required by the Debtor during the term of Cassel Salpeter's engagement under the Engagement Letter, were important factors in determining the Fee Structure. The ultimate benefit to the Debtor derived from the services provided by Cassel Salpeter under the Engagement Letter cannot be measured by a reference to the number of hours expended by Cassel Salpeter's professionals.

16.     It is not the general practice of investment banking firms, including Cassel Salpeter, to keep detailed time records similar to those customarily kept by attorneys and other professionals required by Rule 2016-1 of the Local Bankruptcy Rules for the Southern District of Florida and guidelines of the Office of the United States Trustee for Fee Applications for Professionals in the Southern District of Florida in Bankruptcy Cases (the "Guidelines").

17.     Cassel Salpeter has requested an initial non-refundable fee of $100,000 which is customary in the investment banking services industry.  The balance of Cassel Salpeter's fee is contingent and predicated upon the closing of a Sales Transaction.  As such, the submission of detailed time entries or the filing of fee applications prescribed by the Local Rules and Guidelines would be unduly burdensome and time-consuming.  As such, Cassel Salpeter is requesting that it be excused from compliance with the Local Rules and Guidelines' requirements and the filing of fee applications.

**Indemnification Provision**

18.     Among the terms and conditions in the Engagement Letter is an indemnity for the benefit of Cassel Salpeter and certain other Indemnified Person as defined in *Exhibit A* to the Engagement Letter (the "Indemnity Provision").

19.     The Indemnity Provision is a reasonable term and condition of Cassel Salpeter's engagement. Bankers and financial advisors rely heavily on information provided

by debtors in making contacts with potential lenders, investors, buyers, or other parties to potential transactions. It is customary, for this reason, that investment bankers or financial advisors receive indemnification from the entities for whom they work.  The Indemnity Provision is comparable to those generally obtained by financial advisory and investment banking firms of similar stature to Cassel Salpeter and for comparable engagements in this district and other jurisdictions.

20.    The Engagement Letter makes clear that no indemnification is available for losses that are determined, by a final judicial determination, to have resulted from Cassel Salpeter's gross negligence or willful misconduct.

21.    Cassel Salpeter submits that the Indemnity Provision is customary and reasonable for investment bankers, both out-of-court and in Chapter 11 proceedings and is similar to other indemnification provisions that have been approved by other bankruptcy courts wherein it has been employed.

## Cassel Salpeter's Disinterestedness

22.    In connection with its proposed retention by the Debtor in this case, Cassel Salpeter undertook to determine whether it had any conflicts or other relationships that might cause it not to be disinterested or to hold or represent an interest adverse to the Debtor. Specifically, Cassel Salpeter reviewed a list of the creditors of the Debtor, equity holders and other interested parties of the Debtor as provided to us by the Debtor, the business records of Cassel Salpeter, including its conflicts database, and the responses to conflict checks circulated throughout the firm.

23.    Cassel Salpeter provides financial advice and investment banking services to myriad of clients in the private and public sector, as well as, companies in and out of court

restructuring matters.  As a result, Cassel Salpeter has represented, and may in the future represent, certain parties-in-interest in matters unrelated to this case, either individually or as part of representation of an ad hoc or official committee of creditors or interest holders. In addition, in the ordinary course of business, Cassel Salpeter may engage counsel or other professionals in unrelated matters that now represent, or may in the future represent, creditors or other interested parties in this case.

24.    In the interest of full disclosure, I serve as liquidating trustee to the 1 GC Collections Creditors' Liquidating Trust (the "1 Global Liquidating Trust") as successor to 1 Global Capital, LLC and 1 West Capital, LLC, (collectively, the "1 Global Debtors") jointly administered under Case No. 18-19121-RAM which is pending in the Bankruptcy Court for the Southern District of Florida, Miami Division.  Debtor's counsel, Paul J. Battista and Genovese, Joblove & Battista, P.A., was retained as special litigation counsel to the 1 Global Debtors in August 2019, and following confirmation of the Plan in September 2019 continues to serve as special litigation counsel to the 1 Global Liquidating Trust.

25.    Additionally, I understand that Associated Energy Group LLC and Diversified Aero Services, Inc. may be creditors in this case.  Cassel Salpeter is currently engaged to provide financial advisory work for Associated Energy Group LLC unrelated to this case.  Cassel Salpeter has in the past provided services for Diversified Aero Services, Inc. unrelated to this case.

26.    Cassel Salpeter submits that the foregoing disclosures or connections does not constitute any conflict of interest or in any way impair its disinterestedness in this case.

27.    Neither I nor Cassel Salpeter has or will provide services to any other entity in connection with this case, and neither I nor Cassel Salpeter will accept any fee from any other

party or parties-in-interest in this case, except the Debtor-in-Possession, unless otherwise authorized by the Court.

28.     To the best of the my knowledge, information and belief, no person employed by Cassel Salpeter assigned to this matter has any connection with the United States Bankruptcy Judge assigned to this case or staff member of the U.S. Trustee that would render its retention in this chapter 11 case improper under Bankruptcy Rule 5002.

29.     To the best of my knowledge, information and belief, insofar as I have been able to ascertain after reasonable inquiry, Cassel Salpeter neither holds nor represents any interest adverse to the Debtor and is a "disinterested person" as that term is defined in Bankruptcy Code section 101(14), as modified by section 1107(b).

30.     To the extent that any information disclosed herein requires supplementation, amendment or modification upon Cassel Salpeter's completion of further analysis or as additional information becomes available to it, a supplemental declaration will be submitted to the Court as required by Bankruptcy Rule 2014.

[*Signature to follow on next page*]

## **28 U.S.C. § 1746 DECLARATION**

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 10, 2020.

By:_____

James S. Cassel, Chairman
Cassel Salpeter Co., LLC.

# **EXHIBIT "B"**

## **(ENGAGEMENT LETTER)**



## Cassel Salpeter & Co.
### INVESTMENT BANKING

*Strictly Confidential*

April 6, 2020

Annette M. Eckerle
Vice President / Treasurer / Secretary
Miami Air International, Inc., Debtor-in-Possession
5000 NW 36th Street, Suite 307
Miami, FL 33122

**INVESTMENT BANKING AGREEMENT**

Dear Annette:

We are pleased to confirm our mutual understanding regarding the retention of Cassel Salpeter & Co., LLC ("CS") by Miami Air International, Inc., Debtor-in-Possession, its subsidiaries, affiliates, beneficiaries, successors and assigns (collectively, and with any entity formed or used for the purposes set forth herein, the "Company"), subject to the terms and conditions of this agreement, inclusive of Exhibit A annexed hereto and incorporated herein by reference (the "Agreement"). The Company has filed Chapter 11 bankruptcy proceedings in the U.S. Bankruptcy Court, Southern District of Florida Miami Division, Bankruptcy Petition #: 20-13924-BKC-AJC (the "Bankruptcy").

1. **Purpose of Engagement.** The Company hereby retains CS as its exclusive financial advisor and to provide the Company with general financial restructuring advice and advise it with any Sale Transaction (as defined herein) in connection with the Bankruptcy. For purposes of this Agreement: "Sale Transaction" shall mean, any transaction or series of transactions involving (a) an acquisition, merger, transfer, consolidation, or other business combination pursuant to which all or substantially all of the business assets, subsidiaries, divisions, business segments, operations, revenue, income, securities, or equity interests of the Company are, directly or indirectly, combined with or otherwise acquired by another company; (b) the acquisition, directly or indirectly, by a buyer or buyers (which term shall include a "group" of persons as defined in Section 13(d) of the Securities Exchange Act of 1934, as amended), of equity interests or options, or any combination thereof constituting a majority of the then outstanding economic interests in the Company or possessing a majority of the then outstanding voting power of the Company; or (c) any other purchase or acquisition, directly or indirectly, by a buyer or buyers of any assets, securities or other interests of the Company; or (d) the formation of a joint venture or partnership with the Company or direct investment in the Company for the purpose of

Miami Air International, Inc.
April 6, 2020
Page 2 of 11

effecting a transfer of a controlling interest in the Company to a third party. Any such Sale Transaction may be consummated through any means, including, without limitation, through a Section 363 sale or process under the United States Bankruptcy Code (the "Bankruptcy Code"), or through a confirmed plan of reorganization. Notwithstanding the above, a Sale Transaction will not include a plan of liquidation or a liquidation under a chapter 7 bankruptcy code filing.

2. **Term.** The term of the Agreement shall be for a period commencing on the date hereof and expiring two (2) months from the date hereof (the "Term"). Notwithstanding any termination or expiration of this Agreement, the provisions of this Paragraph 2 and Paragraphs 5, 7, 8, 9, and 10, and Exhibit A, which is attached hereto and incorporated herein, shall survive any such termination or expiration.

3. **Services.** CS will act as the Company's financial advisor with respect to the matters listed below and may perform such services as it deems reasonably necessary.

   a) **General Advisory Services**

      (i) Reviewing and analyzing the Company's business, operations and financial projections;

      (ii) Assisting in the determination of a range of values for the Company on a going concern basis; and

      (iii) Providing testimony, as necessary, with respect to matters on which we have been engaged to advise hereunder in any proceeding before the Bankruptcy Court.

   b) **Sale Transaction Services**

      (i) Assisting the Company in identifying and evaluating candidates for any potential Sale Transaction;

      (ii) Advising the Company in connection with negotiations, and aiding in the consummation of any such Sale Transaction;

      (iii) Advising with regards to possible affiliations with strategic operators;

      (iv) Advising with regards to divestitures of non-strategic assets.

4. **Nature of Engagement.** In order to facilitate CS's efforts under this Agreement, during the Term, the Company shall not authorize any other party to act on the Company's behalf with respect to the services agreed to in this Agreement and the Company will promptly inform CS of any discussions, negotiations, or inquiries regarding any potential Sale Transaction(s), including any such discussions or inquiries that have occurred during the one (1) year period prior to the date hereof. The services provided by CS under this Agreement are solely for the benefit of the Company and are not intended to, nor shall they be deemed or construed to, create any duty toward or confer any rights upon any persons or entities not a party (including, without limitation, securityholders (in their capacities as such), employees or creditors of the Company) as against CS or its affiliates or their respective directors, officers, agents, and employees.

Miami Air International, Inc.
April 6, 2020
Page 3 of 11

5. **Fees.** In consideration for our services described above, CS shall be entitled to receive and the Company agrees to pay CS, the following compensation:

   a) **Initial Fee.** A non-refundable, cash fee, payable by check or wire transfer in immediately available U.S. funds, of: (i) $50,000 on the date hereof; and (ii) $50,000 thirty days from the date hereof.

   b) **Sale Transaction Fee.** If the Company consummates a Sale Transaction, the Company shall pay to CS a sale transaction fee (the "Sale Transaction Fee"), payable by check or wire transfer in immediately available U.S. funds at the closing of the Sale Transaction, equal to $500,000 plus 2.0 % of the Sale Consideration (as defined in Exhibit A) in excess of $10 million.  Notwithstanding the foregoing, in the event any Sale Transaction(s) includes deferred and/or contingent payment(s), the Company shall pay to CS the portion of any Sale Transaction Fee relating thereto, payable in cash by check or wire transfer in immediately available U.S. funds, if and when such deferred and/or contingent payment(s) is actually paid.

   c) **Multiple Closings.**  If more than one Sale Transaction is consummated, CS shall be compensated based on the aggregate Consideration of all Sale Transactions, calculated in the manner set forth above.

   d) **Fee Obligation.**  CS shall be entitled to the fees set forth in this Paragraph 5 if any Sale Transaction is consummated during the Term, or within two (2) years after the date of any termination or expiration of this Agreement (the "Tail Period"), or the Company, or its securityholders, enters into any definitive agreement regarding a Sale Transaction during the Term or the Tail Period that subsequently closes (whether during or after the Tail Period), regardless of whether CS actually procured the agreement regarding the Sale Transaction.

   e) **Reasonableness.**  The parties acknowledge that this engagement will require a substantial professional commitment of time and effort by CS.  Moreover, the amount of time and effort may vary substantially during different periods of this engagement.  As a result, in order to ensure the availability of all necessary professional resources, whenever required, CS may be foreclosed from pursuing other alternative engagement opportunities.  In light of the foregoing, the parties agree that the fee arrangement provided for herein is reasonable and fairly compensates CS.

   All fees due to CS as set forth in this Paragraph 5 shall not be subject to offsets, are non-refundable and non-cancelable.  No fee payable to any third party, by the Company or any other person or entity, shall reduce or otherwise affect any fee payable hereunder to CS.

6. **CS Retention in Bankruptcy Proceedings.**  The Company agrees that it will use its best efforts to obtain prompt authorization from the Bankruptcy Court to retain CS on the terms and conditions set forth in this Agreement under the provisions and standards of review of Section 328(a) of the Bankruptcy Code.  Subject to being so retained CS agrees that during the pendency of any such proceedings, it shall continue to perform its obligations pursuant to this Agreement and that it shall file interim and final applications for allowance of the fees and expenses payable to CS under the terms of this Agreement pursuant to the applicable Federal Rules of Bankruptcy Procedure, and any applicable local rules and order of the Bankruptcy Court.  The

Miami Air International, Inc.
April 6, 2020
Page 4 of 11

Company shall supply CS with a draft of the retention application and proposed retention order authorizing CS's retention sufficiently in advance of the filing of such application and proposed order to enable CS and its counsel to review and comment thereon. The order authorizing the employment of CS as a professional must be acceptable to CS in its sole discretion. CS shall be under no obligation to provide any services under this Agreement unless CS's retention under the terms of this Agreement is approved under Section 328(a) of the Bankruptcy Code by final order of the Bankruptcy Court, which order is acceptable to CS in its sole discretion. The retention application shall note that in agreeing to seek CS's retention under Section 328(a) of the Bankruptcy Code, the Company acknowledges that it believes that CS's general restructuring experience and expertise, its knowledge of the capital markets and its merger and acquisition capabilities will inure to the benefit of the Company in pursuing any Sale Transaction that the value to the Company of CS's services hereunder derives in substantial part from that expertise and experience and that, accordingly, the structure and amount of CS's proposed fees, including the Sale Transaction Fee is reasonable regardless of the number of hours to be expanded by CS professionals in the performance of the services to be provided hereunder, and therefore CS professionals shall not be required to maintain time records, that the proposed fees shall not be considered to be "bonuses" or fee enhancements under applicable law and that all fees and expenses due and payable to CS shall be paid directly out of any gross cash proceeds of any Sale Transaction, or if such gross cash proceeds are not sufficiently available, out of other funds of the Company regardless of the existence of any other unpaid administrative claims.

7. **Lenders**. In consideration for CS's agreement to render services to the Company under the terms of this Agreement, the Company's lenders (included on the signature page below) agree to the following: (a) CS's fees and expenses may be paid to CS free and clear of any lien, claim or interest that the lenders may have in the Company's assets or the proceeds thereof; and (b) in the event that CS becomes entitled to any fees under Paragraph 5 above, the lenders agree to fully subordinate their right to payment of their debt (whether principal, interest or other costs or charges) or any other recovery on its claims to the payment of all fees and expenses due to CS under this Agreement.

8. **Additional Agreements.** In the event that the Company requests CS to provide services exceeding the scope contemplated by this Agreement, the parties will discuss and agree in good faith to the additional fees associated with such services.

9. **Reimbursement of Expenses**. In addition to the fees described in Paragraph 5 above, the Company shall promptly reimburse CS, upon request, for all reasonable out-of-pocket expenses incurred by CS in connection with this Agreement or the performance thereof, whether or not any Sale Transaction, or other type of transaction is consummated, including, but not limited to, travel and lodging, databases, fees and disbursements of CS's counsel, and any other consultants and advisors retained by CS. All fees and reimbursable expenses due to CS hereunder shall have no offsets, are non-refundable and non-cancelable.

10. **Other**. In performing services pursuant to the Agreement, CS is not assuming any responsibility for the decisions of the Company or any other party to pursue (or not to pursue) any business strategy or to effect (or not to effect) any Sale Transaction or other transaction. CS shall not have any obligation or responsibility to provide "crisis management" for or business consultant services to the Company, and shall have no responsibility for designing or implementing operating, organizational, administrative, cash management or liquidity improvements; nor shall

Miami Air International, Inc.
April 6, 2020
Page 5 of 11

CS be responsible for providing or deemed to have providing any tax, accounting, actuarial, legal or other specialist advice.

Miami Air International, Inc.
April 6, 2020
Page 6 of 11

We look forward to formalizing our business relationship.  If the foregoing and the attached Exhibit A correctly set forth our agreement, please execute the enclosed copy of this Agreement in the space provided and return it to us.

Very truly yours,

**CASSEL SALPETER & CO., LLC**

By: _____
James S. Cassel
Chairman

Confirmed and agreed to this __6__ day of April, 2020

**MIAMI AIR INTERNATIONAL, INC.**

By: _Annette M Eckerle_____
Name:   Annette M Eckerle
Title:    Vice President / Treasurer / Secretary

**WITH RESPECT TO LENDER ACKNOWLEDGEMENTS AND PAYMENT OBLIGATION UNDER PARAGRAPH 7 HEREIN**

**TSI HOLDING COMPANY**

By: _____
Name:
Title:

Miami Air International, Inc.
April 6, 2020
Page 7 of 11

## EXHIBIT A

(A)     **Sale Consideration.** For purposes of this Agreement, the term "Sale Consideration" means (x) the total amount of cash and the fair market value (on the date of payment) of all the property paid and payable (including amounts paid into escrow) in connection with any Sale Transaction (or related transaction), including amounts paid and payable in respect of convertible securities, preferred equity securities, minority interest obligations, earn out provisions, non-competition agreements, warrants, stock appreciation rights, option or similar rights, whether vested or not, plus (y) the principal amount of all indebtedness for borrowed money or other liabilities of the Company or relevant Company entity, as applicable, as set forth on the most recent balance sheet or, in the case of the sale of assets, equity or other securities, assumed cure amounts, all indebtedness for borrowed money or other liabilities assumed, cancelled, exchanged, credit bid, or forgiven by any third party.  Sale Consideration shall be based on the value of the Sale Transaction before payment of any expenses related to the Sale Transaction, including payment of the Sale Transaction Fee, any costs associated with reimbursement, and any transaction fees, management fees, or similar remuneration contracted for or paid in anticipation of the closing of the Sale Transaction.  Sale Consideration shall also include the aggregate amount of any dividends or other distributions declared by the Company or relevant Company entity, as applicable, after the date hereof other than normal quarterly cash dividends, and, in the case of the sale of assets, equity or other securities, the net value of any current assets not sold by the Company or relevant Company entity, as applicable.  For purposes of calculating Sale Consideration, (i) all shares will be deemed transferred where a Sale Transaction is effected by the transfer of shares, (a) constituting 50% of the then outstanding equity securities of or equity interests in the Company or relevant Company entity having more than 50% of the economic interest in the Company or relevant Company entity, as applicable, or (b) possessing more than 50% of the then outstanding voting power of the outstanding equity securities of, or an equity interests in, the Company or relevant Company entity, as applicable, and (ii) the value of securities (whether equity or debt) that are freely tradable in an established public market will be determined on the basis of the average closing price in such market for the 10 trading days prior to the closing of the Sale Transaction (the "Valuation Date"); and the value of securities that have no established public market or other property will be the fair market value of such securities or other property on the Valuation Date and any restricted stock (i.e., stock in a public company not freely tradable) received shall be valued at 85% of the public market price of such stock.  The aggregate fair market value of all such securities that have not established public markets and other property shall be determined by CS and the Company, or by an independent appraiser jointly selected by CS and the Company, the cost of which shall be borne entirely by the Company.  Sale Consideration shall also be deemed to include pension liabilities and guarantees of monies borrowed, assumed, cancelled, exchanged, credit bid or forgiven directly or indirectly by a third party.

(B)     **Representations and Covenants.** The Company shall make available to CS, and will use its best efforts to cause other parties to make available to CS, such party's officers, directors, and advisors, and such information as CS may reasonably request for the purpose of carrying out its engagement hereunder.  The Company represents and warrants that all information provided to CS by or on behalf of the Company in connection with this Agreement and the services to be performed hereunder by CS, shall be to the best of the Company's knowledge, true, complete, and correct as of the date of such delivery and shall not fail to state a material fact necessary to make any of such information not misleading.   The Company acknowledges that the ability of CS to adequately provide services as described herein is dependent upon the prompt receipt of accurate, correct, and complete information by CS.   The Company further represents and warrants that this Agreement has been duly and validly authorized by all requisite corporate action; that the Company has the full right, power, and capacity to execute, deliver, and perform its obligations hereunder; and that this Agreement, upon execution and delivery of the same by the Company, will represent the valid and binding obligation of the Company enforceable in accordance with its terms.

(C)  **Indemnification, Reimbursement, Contribution, & Related Matters.**  The Company hereby agrees to indemnify and hold CS, its affiliates, and its and their officers, directors, principals, employees, shareholders, members, representatives, and agents, each person, if any, who controls CS (or any affiliate) within the meaning of either Section 15 of the Securities Act of 1933, as amended, or Section 20 of the Securities Exchange Act of 1934, as amended, and their respective successors and assigns (collectively, the "Covered Persons"), harmless from and against any and all losses, claims, damages, liabilities, deficiencies, actions, suits, proceedings, costs, or expense whatsoever (including, but not limited to, reasonable legal fees and other expenses, and reasonable disbursements incurred in connection with investigating, preparing to defend, or defending any action, suit, or proceeding, including any inquiry or investigation, commenced or threatened, or any claim whatsoever, or in appearing or preparing for appearance as witness in any proceeding, including any pretrial proceeding such as a deposition) (collectively the "Losses") (A) (i) arising out of, based upon, or in any way related or attributed to the Company's actions or failures to act (including statements or omissions made or information provided by the Company or its agents) or breach of this Agreement or (ii) actions or failures to act by the Company or an Covered Person with the Company's consent or in reliance on the Company's actions or failures to act or (B) otherwise related to or arising out of the engagement, CS's performance thereof, any other matter contemplated by this Agreement, or any other services CS is asked to provide to the Company (in each case, including related activities prior to the date hereof), except that this clause (B) shall not apply to any Losses to the extent that they are finally determined by a court of competent jurisdiction to have resulted directly and primarily from the willful misconduct or gross negligence of CS in performing the services hereunder.  The Company will not settle, compromise, or consent to an entry of judgment in, or participate, facilitate or permit any settlement, compromise or entry of judgment on behalf of its directors or officers in, any pending or threatened action, suit or proceeding for which indemnification or contribution may be sought hereunder (whether or not an Covered Person is party thereto), unless such settlement, compromise, or consent includes a release of the Covered Persons reasonably satisfactory to CS in its sole discretion.

If CS or any Covered Person becomes involved in any capacity in any direct or third party action, claim, suit, investigation or proceeding, actual or threatened, brought by or against any person, including, without limitation, stockholders of the Company, in connection with or as a result of the engagement, CS's performance thereof, any other matter contemplated by this Agreement, any other services CS is asked to provide to the Company, or any actions taken or omitted to be taken by an Covered Person or the Company in connection with this Agreement (in each case, including related activities prior to the date hereof), the Company also agrees to promptly reimburse CS and such Covered Persons for their expenses (including without limitation, reasonable fees and expenses of their counsel incurred in connection with investigating, preparing for, and responding to third party subpoenas or enforcing this Agreement ) as such expenses are incurred.

If CS receives written notice of the commencement of any legal action, suit, or proceeding with respect to which the Company is or may be obligated to provide indemnification pursuant to this Section (D), CS shall, within thirty (30) days of the receipt of such written notice, give the Company written notice thereof (a "Claim Notice").  Failure to give such Claim Notice within such thirty (30) day period shall not constitute a waiver by CS or the Covered Persons of their right to indemnity hereunder with respect to such action, suit, or proceeding.

If for any reason the foregoing indemnification is unavailable or is insufficient to hold CS and the Covered Persons harmless, the Company agrees to contribute to such amount paid or payable by CS and the Covered Persons in such proportion as to reflect the relative benefits received by the Company, as the case may be, on the one hand, and CS and the Covered Persons, on the other hand, in connection with the matters contemplated by this Agreement.  If, however, the allocation provided by the immediately preceding sentence is not permitted by applicable law, then the Company shall contribute to such amount paid or payable by CS and any Covered Person in such proportion as is appropriate to reflect not only such relative benefits, but also the relative fault of the Company and its officers, directors, principals,

Miami Air International, Inc.
April 6, 2020
Page 9 of 11

employees, shareholders, members, representatives, and agents, on the one hand, and CS and the Covered Persons, on the other hand, in connection therewith, as well as any relevant equitable considerations.  In no event shall CS and the Covered Persons be required to contribute, or otherwise be liable in connection with the matters contemplated by this Agreement for, an aggregate amount in excess of the fees actually received by CS pursuant to the terms of this Agreement.  Relative benefits to the Company, on the one hand, and CS and the Covered Persons, on the other hand, with respect to the matters contemplated by this Agreement shall be deemed to be in the same proportion as (i) the total value paid or proposed to be paid or received or proposed to be received by the Company and its security holders, as the case may be, pursuant to any Sale Transaction, whether or not consummated, contemplated by this Agreement, bears to (ii) all fees actually received by CS  pursuant to this Agreement.

The Company further agrees that neither CS nor any other Covered Person shall have any liability (whether direct or indirect and regardless of the legal theory advanced) to the Company or any person or entity asserting claims on behalf of or in right of the Company related to or arising out of the Agreement, CS's engagement under this Agreement, any Sale Transaction, or any actions taken or omitted to be taken by an Covered Person or the Company in connection with this Agreement, except for losses, claims, damages or liabilities incurred by the Company which are finally judicially determined by a court of competent jurisdiction (not subject to appeal) to have resulted directly and primarily from the willful misconduct or gross negligence of such Covered Person.  Without limiting the generality of the foregoing, in no event shall CS or any Covered Person have any liability to the Company or any of its affiliates or its or its affiliates' stockholders or other security holders or creditors, or any other person for any consequential, special, exemplary, or punitive damages arising out of the engagement or their performance thereof.

Prior to entering into any agreement or arrangement with respect to, or effecting, any (i) merger, statutory exchange, or other business combination or proposed sale, exchange, dividend, or other distribution or liquidation of all or a significant portion of its assets, or (ii) significant recapitalization or reclassification of its outstanding securities that does not directly or indirectly provide for the assumption of the obligations of the Company set forth in this Agreement and this Exhibit A, the Company will notify CS in writing thereof (if not previously so notified) and, if requested by CS, shall arrange in connection therewith alternative means of providing for the obligations of the Company set forth in this Agreement and this Exhibit A, including the assumption of such obligations by another party, insurance, surety bonds, the creation of an escrow, or other credit support arrangements, in each case in an amount and upon terms and conditions satisfactory to CS in its sole discretion. The Company agrees that CS would be irreparably injured by any breach of this Agreement (including, without limitation, the agreement set forth in the immediately preceding sentence), that money damages alone would not be an adequate remedy for any such breach and that, in the event of any such breach, CS shall be entitled, in addition to any other remedies provided by law or equity, to pursue injunctive relief and specific performance.

(D)     **Confidentiality**. CS acknowledges that, in connection with the services to be provided pursuant to this Agreement, certain confidential, non-public and proprietary information concerning the Company ("Confidential Information") has been or may be disclosed by the Company to CS or its employees, affiliates, attorneys, subcontractors, and advisors (collectively, the "Representatives").  CS agrees that, without the Company's prior consent, no Confidential Information will be disclosed, in whole or in part, to any other person other than: (i) to those Representatives who need access to any Confidential Information for purposes of performing the services to be provided hereunder; (ii) to the Company and its attorneys and other advisors; or (iii) as may be required by law or regulatory authority.  The term "Confidential Information" does not include any information: (a) that was already in the possession of CS or any of its Representatives, or that was available to CS or any of its Representatives on a non-confidential basis, prior to the time of disclosure to CS or such Representatives; (b) obtained by CS or any of its Representatives from a third person which, insofar as is known to CS or such Representatives, is not subject to any prohibition against disclosure; (c) which was or is independently developed by CS or any of its Representatives without violating any confidentiality obligations under this Agreement; or (d) which

Miami Air International, Inc.
April 6, 2020
Page 10 of 11

was or becomes generally available to the public through no fault of CS or its Representatives. If CS becomes required by legal process or requested by regulatory authority to disclose any Confidential Information, prompt notice thereof (to the extent permitted by law, rule, or regulation) shall be given to the Company. The obligations of CS and its Representatives set forth in this paragraph shall remain in effect for a period of one (1) year after the date of this Agreement.

(E)     **Independent Contractor.**  It is expressly understood and agreed that CS has been retained to act solely as an exclusive financial advisor to the Company and, in such capacity, shall, at all times, act as an independent contractor with respect to the Company and not as an employee or agent of the Company, and nothing contained in this Agreement shall be construed to create a joint venture, partnership, association, or other affiliation, or like relationship, between the parties. It is specifically agreed that the relationship is and shall remain that of independent parties to a contractual relationship and that CS shall have no right to bind the Company in any manner. In no event shall either party be liable for the debts, liabilities, or other obligations of the other except as otherwise specifically provided in this Agreement.

(F)     **Amendment.**  No modification, waiver, amendment, discharge, or change of this Agreement shall be valid unless the same is evidenced by written instrument, executed by the party against which such modification, waiver, amendment, discharge, or change is sought.

(G)     **Notices.**  All notices, demands, consents, approvals, or other communications given hereunder shall be in writing and shall be deemed to have been duly given when delivered in person or transmitted by facsimile transmission or on the third calendar day after being mailed by United States registered or certified mail, return receipt requested, postage prepaid, to the addresses herein above first mentioned or to such other address as any party hereto shall designate to the other for such purpose in the manner hereinafter set forth.

(H)     **Entire Agreement.**  This Agreement, including this Exhibit A, contains all of the understandings and agreements of the parties with respect to the subject matter discussed herein. All prior agreements, whether written or oral, are merged herein and shall be of no force or effect. This Agreement, including this Exhibit A, has been reviewed by the signatories hereto and their counsel. There shall be no construction of any provision against a party based on authorship, and the parties waive any statute or rule of law to such effect. The headings are inserted for convenience of reference only and are not intended to be part of, or to affect the meaning or interpretation of, this Agreement including this Exhibit A.

(I)     **Severability.**  The invalidity, illegality, or unenforceability of any provision or provisions of this Agreement will not affect any other provision of this Agreement, which will remain in full force and effect, nor will the invalidity, illegality, or unenforceability of a portion of any provision of this Agreement affect the balance of such provision. In the event that any one or more of the provisions contained in this Agreement or any portion thereof shall for any reason be held to be invalid, illegal, or unenforceable in any respect, this Agreement shall be reformed, construed, and enforced as if such invalid, illegal, or unenforceable provision had never been contained herein.

(J)     **Construction; Venue.**  This Agreement and all aspects of the relationship created by this Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and to be performed therein. The Company agrees that the sole and exclusive venue for any claims, disputes, or other matters arising hereunder (whether based upon contract, tort, or otherwise) shall be the courts of the State of New York or the Federal District Court of the United States for the Southern District of New York, in each case located in the Borough of Manhattan, New York, New York and agrees to waive any objections to such venue. THE COMPANY AND CS EACH HEREBY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY PROCEEDING, SUIT, OR CLAIM (WHETHER BASED UPON CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF OR IN ANY WAY RELATING TO THIS AGREEMENT.

Miami Air International, Inc.
April 6, 2020
Page 11 of 11

(K)     **Binding Nature**.  The terms and provisions of this Agreement shall be binding upon and inure to the benefit of the parties, and their respective successors and assigns. Nothing in this Agreement, express or implied, is intended to confer or does confer on any person or entity, other than the parties hereto, the Covered Persons (as defined in this Exhibit A) and each of their respective successors, heirs and assigns, any rights or remedies (directly or indirectly as a third party beneficiary or otherwise) under or by reason of this Agreement or as a result of the services to be rendered by CS hereunder.

(L)     **Counterparts**.  This Agreement may be executed in any number of counterparts, including PDF or facsimile signatures, which shall be deemed as original signatures. All executed counterparts shall constitute one Agreement, notwithstanding that all signatories are not signatories to the original or the same counterpart.

(M)     **Attorneys' Fees and Court Costs**.  If any party to this Agreement brings an action, directly or indirectly, based upon this Agreement or the matters contemplated hereby against the other party, the prevailing party shall be entitled to recover, in addition to any other appropriate amounts, its reasonable costs and expenses in connection with such proceeding, including, but not limited to, reasonable attorneys' fees and expenses and court costs.

(N)     **Computer Virus**.  During the course of this engagement, CS may exchange electronic versions of documents and emails with the Company using commercially available software.  Unfortunately, the technology community is occasionally victimized by the creation and dissemination of so-called viruses, or similar destructive electronic programs.  CS has invested in document and email scanning software designed to identify and reject files containing known viruses, and therefore CS's system may occasionally reject a communication sent to it.  CS cannot guarantee that its communications and documents will always be virus free.  Occasionally, a virus will escape and go undetected as it is passed from system to system.  Although CS believes its virus protection measures are excellent, it can make no warranty that its documents will be virus free at all times.  Please inform CS immediately in the event a virus enters the Company's system via any electronic means originating from CS.  Through cooperative efforts, disruption to communications can be minimized.

(O)     **Legal Services**.  While certain principals and employees of CS are attorneys, CS is not, in any manner, providing legal services or legal advice to the Company.  Furthermore, the Company agrees and acknowledges that CS is not an advisor as to tax, accounting, or regulatory matters in any jurisdiction.

(P)     **No Fiduciary Duties**.  The Company represents that it is a sophisticated business enterprise that has retained CS for the limited purposes set forth in this Agreement, and the parties acknowledge and agree that their respective rights and obligations are contractual in nature.  Each party disclaims any intention to impose fiduciary obligations on the other by virtue of the engagement as contemplated by this Agreement.

(Q)     **Regulatory Requirements**.  If necessary, the Company agrees to provide CS with information and supporting documentation to enable CS to comply with the requirements under the USA Patriot Act, the Financial Crimes Enforcement Network, and other regulations.

(R)     **Marketing**.  CS shall have the ability to publicize (i.e., use of the Company logo in its marketing materials) its role in providing the services as provided herein.

**<u>EXHIBIT "C"</u>**

**(PROPOSED ORDER)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
**www.flsb.uscourts.gov**

In re:                                                           Chapter 11

**MIAMI AIR INTERNATIONAL, INC.**                    Case No. 20-13924-AJC

        Debtor.

_____/

**[PROPOSED] ORDER GRANTING DEBTOR'S *EXPEDITED* APPLICATION**
**FOR AUTHORITY TO EMPLOY, CASSEL SALPETER & CO., LLC,**
**AS INVESTMENT BANKER TO THE DEBTOR-IN-POSSESSION**
**EFFECTIVE AS OF APRIL 6, 2020**

      **THIS MATTER** came before the Court on **April 15, 2020, at 2:00 pm** in Miami,

Florida, upon the Application (the "Application") of Miami Air International, Inc., (the

"Debtor"), for entry of an order, pursuant to 11 U.S.C. §§ 327(a) and 328(a) of the Bankruptcy

Code, Bankruptcy Rules 2014(a) and 2016 and Local Rules 2014-1(A) and 2016-1(A),

authorizing the Debtor to employ and retain Cassel Salpeter & Co., LLC ("Cassel Salpeter") to

- 6 -

serve as the Debtor's investment banker during the pendency of this case effective as of April 6, 2020, in accordance with the terms and conditions set forth in the  Engagement Letter ("Engagement Letter")[1] dated April 6, 2020, including the Fee Structure and Indemnification Provision set forth herein, and waiving and/or modifying the requirements of Local Rule 2016-1 and Guidelines, of all as further described in the Application; and the Court having reviewed the Application, the Engagement Letter, and the Court, finding that good, adequate, and sufficient cause has been shown to justify the entry of this Order; and it appearing that the relief requested is in the best interests of the Debtor's estate, its creditors and other parties in interest; and the Court having jurisdiction to consider the Application and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Application and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having reviewed the Application and *Declaration of James S. Cassel in Support of Debtor's Application for Authority to Employ Cassel Salpeter & Co., LLC, as Investment Banker to the Debtor-in-Possession Effective as of April 6, 2020* attached to the Application (the "Cassel Declaration"); and the Court being satisfied based on the representations made at the hearing, in the Application and the Cassel Declaration that (a) Cassel Salpeter does not hold or represent an interest adverse to the Debtor's estate, and (b) Cassel Salpeter is a "disinterested person" as defined in section 101(14) of the Bankruptcy Code and as required by section 327(a) of the Bankruptcy Code; and due and proper notice of the Application having been provided, and it appearing that no other or further notice need be provided; and after due deliberation and sufficient cause appearing therefor, it is

---

[1] Capitalized terms not otherwise defined herein have the meanings given to them in the Application or the Engagement Letter, as the case may be.

ORDERED as follows:

1.      The Application, which incorporates by reference all of the terms set forth in the Engagement Letter and Exhibit "A" attached thereto is **GRANTED.**

2.      The Debtor is authorized to retain and employ Cassel Salpeter as its investment banker in this Chapter 11 case, pursuant to sections 327(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rules 2014 and 2016 and in accordance with the terms and conditions set forth in the Application effective as of April 6, 2020.

3.      Cassel Salpeter's employment is necessary and is in the best interests of the Debtor's estate, creditors, and other parties in interest.

4.      The Debtor is authorized to compensate Cassel Salpeter for its services and related expenses according to the Fee Structure described in the Application and Engagement Letter, including the payment of the Initial Fee upon entry of this Order.

5.      Notwithstanding anything to the contrary in the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or any order of this Court, Cassel Salpeter and its professionals shall not be required to file fee applications, maintain or provide detailed time records for services rendered in accordance with the Guidelines for Fee Applications for Professionals in the Southern District of Florida in bankruptcy cases, or otherwise adhere to the requirements of Local Rules and Guidelines.

6.      The Sales Transaction Fee payable pursuant to the Engagement Letter shall be paid immediately and directly from the proceeds of a Sale Transaction (as a necessary cost of such Sale Transaction) at the closing of the Sale Transaction free and clear of any lien, claim or interest that any creditor or claimant may possess in the relevant assets sold or the proceeds received in connection with such Sale Transaction. Notwithstanding the foregoing, in the event

any Sale Transaction(s) includes deferred and/or contingent payment(s), the Debtor shall pay to Cassel Salpeter the portion of any Sale Transaction Fee relating thereto, payable in cash by check or wire transfer in immediately available U.S. funds, if and when such deferred and/or contingent payment(s) is actually paid.

7.      In the event there is more than one Sale Transaction consummated, Cassel Salpeter shall be paid a Sale Transaction Fee based on the aggregate Consideration of all Sale Transactions as set forth in paragraphs 5(b) and (c ) of the Engagement Letter.

8.      The Indemnification Provision contained in Exhibit A to the Engagement Letter is approved.

9.      Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

10.      The Debtor is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Application.

11.      To the extent that there may be any inconsistency between the terms of the Application, the Engagement Letter, Declaration and this Order, the terms of this Order shall govern.

12.      The Court shall retain exclusive jurisdiction to hear and determine all matters arising from or related to the implementation of this Order.

###

**Submitted By:**
Paul J. Battista, Esq.
GENOVESE JOBLOVE & BATTISTA, P.A.
*Counsel for Debtor-in-Possession*
100 SE 2nd Street, Suite 4400
Miami, Florida 33131
Telephone: 305-349-2300
Fax: 305-349-2310

Email: pbattista@gjb-law.com

**Copies furnished to:**
Paul J. Battista, Esq.
[Attorney Battista is directed to serve a conformed copy of this order on all interested parties]